PETTIGREW, J.
|2In this workers’ compensation case, the claimant appeals a judgment of the Office of Workers’ Compensation (OWC). That judgment dismissed his claims, finding the claimant failed to bear his burden of proving the actual occurrence of either of two alleged injury-producing accidents during the course and scope of his employment with defendant, Standard Gravel Co., Inc. (Standard Gravel). After a thorough review of the record and for the following reasons, we affirm.
FACTUAL AND PROCEDURAL HISTORY
Claimant, Richard Lepine, Jr., worked as a dredge operator for Standard Gravel from February 2011 until December 7, 2011, when he was laid off due to a reduction in work force. Although the record before us contains only one of the 1008 disputed claim forms filed by Lepine, the record otherwise reveals that Lepine filed two disputed workers’ compensation claims listing two injury-producing work-related accidents — one allegedly occurring on November 8, 2011, and the other on December 7, 2011. The record also reveals that the two claims — docket numbers 12-01178 and 12-01179 — were consolidated by the workers’ compensation hearing officer by order dated June 26, 2012.
The disputed claim for compensation contained in the record before us was filed by Lepine on February 22, 2012, alleging that he suffered injury as a result of a work-related incident which occurred on November 8, 2011. In that claim, Lepine asserted that he was employed as a dredge operator for Standard Gravel in Washington Parish, when he was “[pjulling [a] cable out of a pond and injured [his] back.” According to his claim form, Le-pine reported the accident to his supervisor, James Bounds[1], on the date of the accident. Also in that claim form, Lepine asserted he was treated for the injury sustained as a result of that accident at Slidell Memorial Hospital, at the Neuroscience and Pain Institute by Dr. Jonathan Thompson in Covington, and by Dr. Pedro Serrant in Slidell. Lepine alleged that defendants, Standard Gravel and, its insured, Liberty Mutual ^Insurance Company (Liberty Mutual), failed to pay wage benefits, refused to authorize an evaluation by his physician of choice, and failed to authorize any medical treatment. He further alleged that the defendants were arbitrary and capricious in their failures, entitling him to an additional award of attorney’s fees, penalties, and interest.
*38 The record does not contain a copy of, but refers to, the second disputed claim form that was filed by Lepine alleging the occurrence of a December 7, 2011 work-related incident that also resulted in injury. He claimed that while he was breaking down a pump, he was pulling on wrenches when he fell backwards onto his back, causing injury thereto. He, again, alleged that he reported the incident and injury to his supervisor, James Bounds, who, allegedly, then terminated his employment.
The defendants answered the claims, generally denying all allegations, except to admit that Lepine was employed by Standard Gravel at the time of the alleged accident, and that at that time, Standard Gravel’s workers’ compensation insurer was Liberty Mutual. Further answering, defendants asserted a dispute as to whether any accident even occurred, and in the alternative, only if an accident or accidents are proven to have occurred, the extent of any alleged work-related injury or any benefits that may be payable therefor.
A hearing was held on October 1, 2012, before the OWC, following which a judgment was rendered and signed on October 31, 2012, dismissing Lepine’s claims, finding he failed to carry his burden of proof that he suffered a work-related accident with injury within the course and scope of his employment on either of the dates alleged.
In reasons for judgment, the OWC noted that Lepine had no witnesses at trial to support his testimony that he suffered those two work-related accidents: “[Claimant has nothing but his own testimony that he suffered an accident on 12-7-2011.” Moreover, the OWC noted that the other witnesses, besides Lepine, disputed the occurrence of any accidents involving Lepine, and that defendants’ witnesses consistently testified that Lepine did not report any accident until after he was told he was being laid off. Based on those findings, the OWC concluded claimant failed to carry his burden of proof and dismissed his claims. This appeal by Le-pine followed.
14ASSIGNMENT OF ERROR
In his sole assignment of error, Lepine asserts the OWC erred in determining he did not “suffer a work-related injury,” which raised the issue of whether the OWC erred in concluding he did not present sufficient evidence “of an injury.” He also argues the OWC erred in not applying the presumption of causation. Notably, the claimant’s assignment of error, rather than addressing the finding on which the OWC’s judgment was based — that he failed to prove the accident occurred— instead, argues about causation; i.e., that the OWC found he did not prove an injury resulting from an accident, a finding the OWC did not need to reach, having found a failure to prove the occurrence of an accident.
Inasmuch as the OWC’s finding that there was no proof that any work-related accident occurred, we pretermit any analysis or discussion of causation and/or the existence of injury, we also pretermit Le-pine’s arguments concerning that nonissue, and instead, review the record to determine the propriety of the OWC’s findings regarding the occurrence of work-related accidents.
APPLICABLE LAW
In Ardoin v. Firestone Polymers, L.L.C., 10-0245 (La.1/19/11), 56 So.3d 215, the supreme court summarized the law applicable to the factual scenario presented in this case as follows:
A worker in a compensation action must establish “personal injury by accident arising out of and in the course of his *39 employment.” La.Rev.Stat. 23:1031(A). An accident is “an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” La.Rev.Stat. 23:1021(1). As in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident. Nelson v. Roadway Express, Inc., 588 So.2d 350 (La.1991); Prim v. City of Shreveport, 297 So.2d 421 (La.1974). An employee may prove by his or her testimony alone that an unwitnessed accident occurred in the course and scope of employment if the employee can satisfy two elements: (1) no other evidence discredits or casts serious doubt upon the worker’s version of the incident; and (2) the worker’s testimony is corroborated by the circumstances following the alleged accident. Bruno v. Harbert International, Inc., supra, 593 So.2d [357] at 361 [(La.1992)] (citing West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); |fiMalone and Johnson, 13 Civil Law Treatise, Workers’ Compensation, Section 253 (2d Ed.1980)), As we noted in Bruno, corroboration of the worker’s testimony may be provided by the testimony of fellow workers, spouses, or friends, or by medical evidence. Id.
56 So.3d at 218-19. Moreover, it is well settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1979).
EVIDENCE PRESENTED
The only evidence presented by Lepine in support of his claims was a pay stub from Standard Gravel, Lepine’s medical records, the deposition testimony of Dr. Jonathan Thompson, a pain management specialist, and Lepine’s own testimony. Notably, of this evidence, the only evidence pertinent to the occurrence of the alleged work-related accidents was Le-pine’s own testimony.
According to Lepine’s testimony at the hearing, he stated that on approximately November 8, 2011, he was performing his duties as a dredge operator, moving anchors and utilizing approximately 300-400 feet of steel cable, when the “port cable got popped on the dredge.” According to Lepine, he then had to go out on a small steel boat and retrieve the broken cable, by pulling it up manually. While doing so, he stated he felt pain in his neck. He stated that when he went back to the scale house after work that evening, he mentioned to his supervisor. Bounds, that he had hurt himself pulling up that cable. He testified that Bounds told him he probably was sore from using muscles he was not accustomed to using. However, Lepine testified that he reported back to work the next day, and again told Bounds that he was still hurting and that he had injured himself pulling up the cable the previous day. Lepine stated that he continued to work, and the pain continued to worsen; so, on December 1, 2011, he sought treatment at Slidell Memorial Hospital. He testified that he reported having headaches with pain radiating down and into the neck, which had been occurring for several weeks prior. Lepine testified that he returned to work the next day and told Bounds that he had been instructed to follow up with his own doctors to determine the cause of his headaches.
| fiWith regard to the second alleged accident, Lepine testified that on December 7, 2011, he was again working as a dredge operator when the shaft broke, requiring *40 him to disassemble the pump by using large ratchets and wrenches to break the “big old bolts” loose. He stated the bolts were large and very tight, and that when they would “pop loose” all of a sudden, “it felt like a shockwave running through your body.” After getting three bolts loose, Lepine started having cramps, but “just kind of blew them off and kept on working, doing what I can do.” He stated that later that afternoon, he again reported to his supervisor, Bounds, that he was having cramps and wasn’t feeling very well. He stated that when he and Bounds arrived at the scale house, where he believed they were going to get a crane they needed, Bounds told him he was being laid off.
According to Lepine, the following morning, December 8, 2011, he felt that he had hurt himself, since he was having trouble walking, and he went back to Slidell Memorial Hospital.
The medical records consist of an emergency room record from Slidell Memorial Hospital, revealing that Lepine went to the emergency room on December 1, 2011, complaining of head and neck pain that he reported had. been occurring for three days. Notably, he did not report the occurrence of any accident or injury. He underwent x-rays to the head and neck, which revealed no fractures or abnormalities. He was discharged that same day, with a diagnosis of neck spasms and given prescriptions for steroids, a muscle relaxer, and pain medication. He was advised to follow up with his primary physician.
The record also contains the emergency room record from Slidell Memorial Hospital for December 8, 2011, when Lepine returned for treatment, this time complaining of flank pain that had lasted for one day. Again, he did not report the occurrence of an accident or incident in connection with the pain, although he did report that the day prior, he had been working with heavy machinery. He underwent a CT scan of the abdomen, which failed to reveal any abnormalities. He was diagnosed with lumbosacral strain and discharged with anti-inflammatory medications, a muscle relaxer, and pain medicine. He was also advised to follow up with his primary care physician within two days.
|7On December 13, 2011, Lepine followed up with Dr. Pedro Serrant, and complained of back pain, limited range of movement and limited activity as a result of that pain, which he reported had lasted a week. He also complained of headaches. Notably, again, he reported no injury or accident in connection with the pain[2] Dr. Serrant ordered an MRI and advised Lepine to seek the help of a spine specialist, Dr. James C. Butler, whom Lepine saw on December 21, 2011.
Dr. Butler reviewed the MRI of Le-pine’s spine and diagnosed him with a symptomatic L5-S1 disc extrusion with L5 nerve root compression and a L3-4 forami-nal disc protrusion of unknown clinical significance. According to Dr. Butler’s notes, Lepine did mention to him that he thought his symptoms may be work related, as his pain began when he was at work, rebuilding a pump, and the following day, he awoke, unable to walk. Dr. Butler discussed his findings with Lepine and treatment options, such as physical therapy, epidural steroid injections, observation, and surgery. Lepine was instructed to contact Dr. Butter when he decided how he wished to proceed.
The record also contains medical records from the Neuroscience and Pain Institute, where Lepine was treated on January 3, *41 2012, after being referred by Dr. Serrant. There, he reported suffering from lower back pain, radiating down the left leg, which he stated began while he was working, pulling a cable out of a pond, on November 11, 2011, and had continually gotten worse over time, Dr. Jonathan Thompson at the Neuroscience and Pain Institute reviewed, Lepine’s MRI and diagnosed him with lumbar/thoracic radicu-lopathy, lumbar disc herniation and degeneration, lumbosacral spondylosis, and “long-term use of medications.” He recommended treating Lepine with epidural injections, and following up with physical therapy. He also continued Lepine on the same medications and asked him to follow up with him in one month. Dr. Thompson also opined that as of that date, January 3, 2012, Lepine could not work, due to his back pain and diagnoses.
IsAfter introducing the aforementioned medical records and his testimony, Lepine rested. The defendants then presented the testimony of Lepine’s co-worker, Michael Norton, and Lepine’s supervisor, James Bounds. Both of these men disputed Lepine’s account of pulling hundreds of yards of steel cable alone, They both testified that the most cable pulled up at one time is three to four feet, and that it would be a physical impossibility for any one person to manually pull up as much steel cable as claimed by Lepine. Furthermore, both men testified that they worked on a daily basis with Lepine, that neither of them ever witnessed Lepine have any kind of accident or exhibit any signs of having sustained any type of injury while working. Bounds specifically testified that Standard Gravel had an immediate reporting policy in place, where any work-related accident or incident must be immediately reported to one’s supervisor. Bounds further testified that Lepine had never reported to him the occurrence of any accident, incident, or the sustaining of any injury. He specifically denied that Lepine complained to him on December 7, 2011, of having suffered any cramps or any other type pain or injury while working. He stated that the only discussion he had with Lepine on that date was that he would have to lay him off due to a reduction in the work force. They also both testified that the first they ever heard of Lepine having been injured while at work was when they became aware that he was filing claims based thereon.
CONCLUSION
Based on the foregoing, which summarizes the totality of the evidence presented in support of Lepine’s claims, we cannot say the OWC erred in any way in. concluding that Lepine failed to bear his burden of proving, by a preponderance of the evidence, that a work-related accident occurred, much less, that such accident resulted in compensable injury. As noted by the OWC, the only evidence that any accident occurred was the self-serving testimony of the claimant himself. Moreover, Lepine’s account of events was directly contradicted by his co-worker and supervisor, whom, despite working in close proximity with Lepine on a daily basis, never witnessed any such accident or the activities in which Lepine claimed to be engaged when such accidents purportedly occurred. Additionally, the medical records also reveal that Lepine failed to report a work-related ] ¡¡accident that allegedly caused his injuries until the last treatment he sought, in January 2012. And, finally, despite being aware that all work-related accidents must be immediately reported and written up, Lepine failed to prove that he had followed company procedure by reporting the two alleged incidents, thus, leading to his lack of proof that any such accidents or incidents occurred.
*42 Accordingly, the judgment of the OWC is hereby affirmed. Costs of this appeal are assessed to the plaintiff, Richard Le-pine.
AFFIRMED.

. Although the claim form identifies the supervisor as James Bond, the remainder of the record establishes his correct identity as James Bounds.

. In a subsequent report, Dr. Serrant indicates that at the December 21, 2011 visit, Lepine did attribute his injuries to a work-related incident.